UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                            )
SECURITIES AND EXCHANGE                     )
COMMISSION,                                 )
                                            )
                Plaintiff,                  )          Civil Action No.
                                            )
        v.                                  )
                                            )
JERRY S. WILLIAMS,                          )          JURY TRIAL DEMANDED
MONK'S DEN, LLC, and                        )
FIRST IN AWARENESS, LLC,                    )
                                            )
                Defendants,                 )
                                            )
_____)

## COMPLAINT

        Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants Jerry S. Williams ("Williams"), First In Awareness, LLC ("FIA"), and

Monk's Den LLC ("Monk's Den") (collectively, "Defendants"):

## INTRODUCTION

        1.      From at least early 2009 through at least the end of 2010, Jerry Williams, a stock

promoter, and two legal entities he created and controlled, Monk's Den and FIA, perpetrated an

internet-based scalping scheme involving the stock of two companies, Cascadia Investments, Inc.

("Cascadia") and Green Oasis Environmental, Inc. ("Green Oasis").  Scalping is a type of fraud

in which the owner of shares of a security recommends that security for investment and then

immediately sells it at a profit upon the rise in market price which follows the recommendation.

Williams, who owned Cascadia and Green Oasis stocks, repeatedly recommended and instructed

other investors to buy, hold and accumulate these stocks.  As a rise in market price followed

these repeated recommendations and instructions, Williams immediately sold his holdings at a profit, deceiving all of the investors and potential investors who had been told to buy and hold Cascadia and Green Oasis.

2.      During the period from early 2009 through the end of 2010, Williams moderated a message board on a popular, internet-based, stock-trading discussion forum ("Internet Forum"), on which investors discussed stocks and trading strategies.  Through control of an Internet Forum message board, known as "Monk's Den," Williams developed a large group of followers who often followed his instructions concerning securities trading.

3.      At first, Williams recommended that his followers buy certain stocks, which he called "Plays."  Beginning in June 2009, however, Williams began promoting a specific trading strategy called a "Float Lock Down" and, during 2010, promoted this strategy through his message board and through in-person, fee-based trading seminars that Williams called "Monkinars."  According to Williams' Float Lock Down strategy, certain market participants, specifically market makers, routinely engaged in "naked short selling" of penny stock companies – i.e., selling short stocks without having arranged to borrow the stock needed to cover their short position.  Williams convinced his followers that if they collectively purchased all the outstanding shares of a company (the "float") whose stock the market makers had sold short, they could create a "short squeeze" that would force the market makers to eventually cover their short position at prices dictated by those who had accumulated the float.

4.      Williams persuaded his followers to pursue this Float Lock Down strategy with at least two thinly traded stocks, Cascadia and Green Oasis.  By various means – including publicizing the stocks through Internet Forum message boards, email messages, and his Monkinars –Williams encouraged his followers to buy, hold, and continue to accumulate

Cascadia and Green Oasis shares.  At the same time Williams was telling his followers to buy and hold these stocks, however, he was actively selling shares of Cascadia and Green Oasis. Williams never disclosed the material fact that he was selling his shares at the same time he was telling his followers to buy, hold and accumulate these stocks.

5.      Not only did Williams fail to tell his followers that he was selling as he was telling them to buy and hold, but he also failed to disclose them that he had in fact been hired by Cascadia and Green Oasis to promote their stocks.  Prior to Williams' announcement of his Plays and Float Lock Downs, Cascadia and Green Oasis paid Williams with millions of free or heavily discounted shares to promote their stocks.  Williams subsequently sold these free or heavily discounted shares as he told his message board followers to buy, hold and accumulate these stocks.

6.      Finally, in 2010, Williams helped create a fund – called the U.S. High Performance Fund (the "USHPF") – through which he claimed that he would apply his Float Lock Down strategy.  As investment adviser for the USHPF, Williams bought several thousand shares of Green Oasis stock on behalf of the fund in supposed pursuit of the Float Lock Down. At the same time, however, Williams sold his own personal holding of Green Oasis stock. Williams never disclosed to his fiduciary, the fund, that he was selling Green Oasis stock as he bought it for the fund.

7.      Through this unlawful and deceptive scalping scheme, Williams, FIA and Monk's Den reaped unlawful profits in excess of $2.4 million.

8.      By engaging in the conduct alleged herein, Defendants violated Sections 17(a) and 17(b) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

9.    Based on these violations, the Commission seeks:  (1) entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; (3) the imposition of civil monetary penalties due to the egregious nature of Defendants' violations; (4) as to Defendant Williams only, a bar from participating in the offering of a penny stock; and (5) such other equitable relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

10.    The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9].  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Sections 21(d) and (e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), (e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

11.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because a substantial part of the events constituting the alleged violations occurred in the District of Connecticut and because Williams lived in Connecticut during much of the period during which he operated his fraudulent schemes.

12.    In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

13.    Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

14.    Unless enjoined, Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

**DEFENDANTS AND RELATED PARTIES**

**I.    Defendants**

15.    **Jerry S. Williams**, age 45, is currently a resident of Mesa, Arizona.  During 2009 through at least July 2010, Williams resided in Connecticut.  Williams is the owner and sole shareholder of FIA and Monk's Den.

16.    **FIA** is a Connecticut limited liability corporation, incorporated in 2008, of which Williams is the sole owner.  Until at least July 2010, Williams operated FIA in Connecticut.  In or about August 2010, Williams moved to Mesa, Arizona, from where he continued to operate FIA.

17.    **Monk's Den, LLC** is an Arizona limited liability corporation, incorporated in August 2010, of which Williams is the sole member.  From 2007 until August 2010, Williams operated Monk's Den as an unincorporated, sole proprietorship that he exclusively controlled.

**II.    Related Parties**

18.    **Cascadia Investments, Inc**. is a Nevada corporation with a principal place of business in Tacoma, Washington.  Cascadia purports to be a real estate development company that, on or about June 2009, began focusing on the acquisition of undervalued internet properties.  On June 21, 2011, the Commission temporarily suspended trading in Cascadia because of questions regarding the adequacy and accuracy of information about the company, including its

assets, business operations, current financial condition and/or issuances of shares in company stock.

19.      **Green Oasis Environmental, Inc.** is a Florida company with a principal place of business in Alberta, Canada.  According to public filings made since 2009, Green Oasis is in the business of oil remediation, focusing its efforts on, among other things, acquisitions of technology concerning the remediation of slop oil.

## FACTUAL ALLEGATIONS

### I.      Background

20.      On July 5, 2007, Williams, an active day trader, joined Internet Forum.  Internet Forum provided, and continues to provide, an online discussion platform for investors to gather, to share, and to discuss stocks, trading strategies, and other financial topics.  Among other things, Internet Forum offers financial message boards for individuals, which are moderated by Internet Forum subscribers.  Persons with internet access can access these Internet Forum message boards and either post information or read posts placed by other users.  Williams became the moderator of an Internet Forum message board called "Monk's Den" and adopted the subscriber alias and persona "Monk."

21.      As the moderator, Williams could communicate with other Internet Forum subscribers by public posts, which would be viewed by all Internet Forum subscribers, or private posts, which could be viewed only by selected parties, as well as by mass emails ("Email Alerts") to subscribers that had signed up to receive such emails from him ("Monk's Den message board subscribers").  Williams created the content of the Monk's Den message board, selected the discussion topics that restricted message board discussions to his stock recommendations and strategies, and chose the board's assistant moderators.   Later, Williams

also created two newsletters – one entitled the "Denformational Newsletter" and the other "Mondays with Monk" – that discussed his stock recommendations, strategies, and other activities, which he distributed through an Email Alert.

22.    After establishing himself on Internet Forum as Monk with a dedicated message board, Monk's Den, Williams began promoting stocks.  On November 8, 2008, Williams formed FIA and began using it to conduct his stock promotion business.  Williams controlled all aspects of FIA, including signing contracts on its behalf and hiring and directing employees and sub-contractors.  FIA essentially served as an alter ego for Williams.

23.    As a compensated stock promoter, Williams had to abide by the Internet Forum's Terms of Service, which required him to register as an Investor Relations Professional ("IRP"), pay a monthly fee to activate and to maintain an IRP subscription, and create a disclosure page providing details of his promotional work, all of which would be visible to other Internet Forum subscribers.  The IRP subscription also activated an icon, visible on the subscriber's profile in Internet Forum, indicating that the subscriber was a compensated promoter.  Williams signed up for an IRP subscription on October 22, 2008, but it expired three months later on January 22, 2009, and was never renewed.

24.    Although Williams initially created a website for FIA that was supposed to disclose those companies that had hired him to promote their stocks, along with any compensation that he received, by at least April 2009, the website had been de-activated. Moreover, even when active, the website failed to disclose all of Williams' compensated promotional activity including, significantly, his promotional work for Cascadia.

25.    Williams used the Monk's Den message board to market himself as an enormously successful trader who, through years of experience, had learned certain trading

techniques that would enable other people to also become successful stock traders.  As part of

this effort Williams claimed – falsely – that he had a PhD in structural engineering from, among

others, the University of Connecticut.  Williams used the message board to make stock

recommendations – including those of companies that he promoted – and as a forum to discuss

those recommendations.

26.     At first, Williams' stock recommendations consisted of "Plays," which were

recommendations to buy a stock because Williams predicted its price would rise short term.  By

mid-2009, however, Williams also began marketing a concept he called a "Float Lock Down."

According to Williams, by collectively buying and holding the outstanding shares, or float, of

companies selected by Williams, investors could trigger a "short squeeze," forcing "market

makers" that had shorted the stocks to buy the investors' shares at enormous profits.

27.     Williams emphasized that to create a Float Lock Down it was first necessary to

identify a stock with the right share structure, short interest position, and other factors, which

would make it susceptible to a short squeeze.  Williams claimed that he had the expertise to be

able to identify the appropriate companies for a Float Lock Down.

28.     After identifying the appropriate company, Williams claimed, investors would

have to collectively purchase, hold, and continue to accumulate the company's outstanding

shares, or float.  Williams stated that even after purchasing most or all of the outstanding shares,

investors should continue to try and buy more shares.  Williams maintained that market makers

would see the demand and engage in "naked shorting" – selling shares without having arranged

to borrow shares – to take advantage of the demand.  Williams claimed that eventually the

market makers' naked short position would become so large that they would be forced, under

Commission guidelines and their own internal pressures, to cover their position. According to Williams, this would lead to the "short squeeze."

29.     Williams emphasized that to successfully deploy the Float Lock Down strategy, the investors would have to work together as a team: that is, they had to buy, hold and continue to accumulate the stock until the short squeeze occurred, even when the price of the stock rose and they could potentially profit by selling prior to the purported short squeeze. Consequently, he repeatedly discouraged individuals from making short term profits from temporary price increases caused by those deploying the Float Lock Down strategy. Williams claimed such sales would undermine the timing of the short squeeze by delaying the locking of the float or by allowing market makers to cover their short position before the short squeeze occurred.

30.     Leading up to the end of 2009, the Float Lock Down concept had become the focus of Williams' trading recommendations and the main topic of discussion on the Monk's Den message board. By then, Williams had even modified the Monk's Den message board "iBox" (which was the portion of the message board that introduced the message board to users) to state: "Welcome to Monk's Den . . . . We profit by buying and holding selected company stocks and locking down the float of chosen companies."

31.     Beginning in or around December 2009, Williams began teaching classes, called "Monkinars," on his stock trading techniques. Williams initially marketed these classes as a way to earn money so that people could participate in his Float Lock Down strategies.

32.     At first, Williams' Monkinars consisted of a few individuals who followed his message board. Williams proved to be an engaging personality, however, and the classes grew in popularity. Williams soon began holding classes throughout the country (and in some cases out of the country), charging between $1,000 and $1,500 per person, depending on the class. He

also began categorizing the classes: "Basic Monkinars," for those attending their first class along with "Advanced Monkinars" and "Uber Monkinars" for returning participants. Williams arranged for hotels bookings, activities, and often attended meals with the participants.

33.    Although his Monkinars were advertised as part of Monk's Den, Williams operated them through FIA until at least August 2010, when he incorporated Monk's Den as a limited liability company. Among other things, Williams used FIA funds to pay the employee responsible for organizing the logistics for the Monkinars, and in some instances deposited fees from the Monkinars into an FIA account. Williams also transferred profits from his scalping activities to an FIA account.

34.    From December 2009 through October 2010, Williams held approximately 18 Monkinars in cities across the United States, including Los Angeles, Richmond, Phoenix, Atlanta, Indianapolis, Chicago, Portland, Pittsburgh, Grand Junction, Groton, and Boston. Williams also held Monkinars in Japan, Germany and Barbados. By October 2010, Williams charged $1,500 per person for a "Basic" Monkinar held in Boston, Massachusetts, which drew approximately 90 people. Williams marketed his Float Lock Down strategy during many of the Monkinars, often discussing it with attendees. Williams also posted photos of the Monkinars on his message board. In one such photo, the picture shows attendees wearing shirts bearing the phrase "Lock the Float" across the front.

35.    Williams' popularity grew considerably during this period, and during 2010, the Monk's Den message board became one of the most popular boards on Internet Forum. For example, during June 2009 through December 2009, anywhere between 105 and 235 Internet Forum subscribers posted between 2,619 and 11,682 messages on a monthly basis. In 2010, these numbers grew dramatically. For example: during January 2010, 268 subscribers posted

16,392 messages; during February 2010, 400 subscribers posted 30,417 messages; and during March 2010, 738 subscribers posted 38,310 messages. From April 2010 through September 2010, anywhere between 447 and 604 subscribers posted between 14,970 and 23,621 messages, on a monthly basis.

36.    As his following grew, Williams hired three employees whom he used to help administer the Monk's Den message board, organize and teach at his Monkinars, write columns for his newsletters, and communicate with his followers about, among other things, his stock recommendations and trading strategies. All these activities became collectively associated with "Monk's Den," which Williams operated as an unincorporated sole proprietorship until August 2010, when he incorporated it as a limited liability corporation. Williams directed and controlled all aspects of Monk's Den and the entity served as an alter ego for Williams. During approximately October 2010, Williams launched a private website and began transferring much of his activity from Internet Forum to that site.

37.    As the Monk's Den message board and Monkinars became increasingly popular, Williams began erasing available evidence of his promotional activities. As discussed above, by January 2009, Williams had discontinued his IRP subscription with Internet Forum. As a result, the Internet Forum icon that designated Williams as an active promoter switched to one that designated Williams as a former promoter. By at least April 2009 if not earlier, Williams discontinued the FIA website that purportedly disclosed his promotional activity. On September 21, 2009, at Williams' request, Internet Forum removed the expired IRP icon from his subscriber profile, thereby hiding any association with promotional work, past or present. By at least December 2009, Williams had told certain followers that he was not involved in promoting

stocks.  During 2010, Williams told participants at his Monkinars that while he had been a stock promoter in the past, he no longer promoted stocks because he did not want to "hurt" people.

38.    In reality, Williams continued his promotional activity.  As described more fully below, Williams, operating through FIA and Monk's Den, used the undisclosed promotional activity, along with the Plays and Float Lock Downs, his Monkinars, message board posts, and other means, to effectuate his scalping scheme.

## II.    The Scalping Scheme

39.    From March 2009 through at least 2010, Williams, through FIA and Monk's Den, knowingly or recklessly schemed to defraud buyers and holders of Cascadia and Green Oasis stock by recommending it to his followers while simultaneously selling his own shares.  The scheme occurred in the following way.   Williams contracted with Cascadia and Green Oasis to promote their stock in exchange for millions of free and discounted shares.  After receiving his shares, Williams created demand for the stocks by promoting them to his Monk's Den followers as "Plays" or buys and by selecting them as targets for Float Lock Downs.  In order to encourage Monk's Den followers to buy and hold stocks in pursuit of the Play or Float Lock Downs, Williams made materially false and misleading statements through the Monk's Den message board, his Monkinars, newsletters, Email Alerts, and other means.  As Williams' followers pursued these strategies, Williams scalped them by selling his stock holdings.

40.    In addition, Williams recommended and began purchasing Green Oasis stock for a pooled-investment fund for which he served as an investment adviser.  Williams bought shares of Green Oasis for the fund and the prices of these shares surged.  Unbeknownst to the fund or its investors, however, at the same time, Williams was selling his shares of Green Oasis stock.

A.    **The Cascadia "Play"**

41.    During March 2009, Cascadia's CEO hired Williams to promote the company in exchange for 14 million Cascadia shares.  When Williams received the shares on March 18, 2009, Cascadia stock had no trading activity.

42.    On March 19, 2009, Williams recommended Cascadia as a Play and began touting the stock.  Cascadia's trading volume spiked to over 7.7 million shares traded that same day, and its share price closed at $.0036.

43.    On March 20, 2009, Williams hired another promoter to help promote Cascadia, paying him 1.5 million Cascadia shares.  On March 26, 2009, Williams emailed another stock promoter to see whether he could "get [Cascadia] moving" so that he could "get steady enough volume for an exit."  Williams also knew, and failed to disclose to his followers, that Cascadia had independently hired other promoters to market the company during this time frame and that they too were disseminating promotional information about the company.

44.    As Cascadia's share price began rising, Williams started selling his shares.  On March 23, 2009, he sold approximately 1.1 million Cascadia shares, gaining profits of over approximately $4,329.  On March 25, 2009, he sold approximately 950,000 Cascadia shares for profits of over approximately $3,369.  And, on March 27, 2009, he sold over approximately 200,000 Cascadia shares for profits of approximately $600.

45.    Williams recommended Cascadia as a "play" to potential investors through at least May 2009 without ever disclosing his promotional activity.  During this time, he continued to publicize the company, and encouraged others to do the same.  During the same months of March, April and May 2009, Williams sold approximately 2.3 million, 3.2 million, and 1.1

million Cascadia shares, respectively, for profits of over approximately $16,000.  Williams never disclosed any of his sales to the potential investors to whom he recommended Cascadia as a play.

46.     Williams, FIA, and Monk's Den knowingly or recklessly misled potential investors by recommending the purchase of Cascadia stock while omitting to state the following material facts, among others: (i) that Williams had been hired, and been compensated with 14 million shares, to promote Cascadia; (ii) that Williams had hired other promoters to help raise Cascadia's stock price; and (iii) that Williams was selling his Cascadia shares while recommending the purchase of Cascadia to his followers.  These facts would have assumed actual significance in the deliberations of a reasonable investor receiving the Defendants' recommendations to purchase Cascadia stock.

### B.    The Float Lock Down Strategy

47.     During 2009 through 2010, Williams, both directly and through FIA and Monk's Den, used emails, message board posts, his Monkinars, and other means to market his Float Lock Down trading strategy to potential investors.  Williams knowingly or recklessly used the purported Float Lock Down strategy as a way to generate demand for a stock – by encouraging potential investors to buy and hold the stock – thereby leading to a rise in its share price into which he could sell his own shares.

48.     Williams told potential investors that for the Float Lock Down strategy to work, they had to (a) purchase all the outstanding shares, or float, of a company; and (b) continue to hold those shares, even as the price of the stock rose.  Williams claimed that if they held and continued to buy the shares for a sufficient period of time, they would eventually trigger a "short squeeze" in which the stock price would rise exponentially and investors could sell their shares at ever increasing prices to the market makers.  Williams suggested to potential investors that

based on his previous experience participating in successful Float Lock Downs, he would be able to recognize the signs of the event and then tell his followers when the squeeze occurred. Williams in fact never told his followers that a Float Lock Down occurred.

49.     To maintain his followers' pursuit of the Float Lock Down mirage, Williams actively discouraged investors from selling the Float Lock Down stocks as share prices rose. Williams knowingly or recklessly misled investors by telling them that selling before the short squeeze occurred would delay locking of the float, while omitting to state the following material fact: that Williams himself was contemporaneously violating his purported strategy by selling his holdings of the same Float Lock Down stocks.

50.     In addition, Williams enticed his followers to purchase stock in pursuit of the Float Lock Down strategy by knowingly or recklessly making materially false and misleading claims about the strategy's past performance, about Williams' experience and qualifications, and about Williams' purported due diligence investigations of the issuers.

51.     For instance, Williams used the Monkinars to market himself as an enormously successful trader who, through years of experience, had learned certain trading techniques that would also enable other people to become successful stock traders.  As part of this effort Williams claimed – falsely – that he had a PhD in structural engineering from various reputable educational institutions, including, the University of Connecticut, Central Connecticut State University, and Concordia College of Bronxville, New York.  In reality, Williams does not have a doctorate degree from any of these institutions.  Instead, Williams merely purchased a purported PhD certificate from an unaccredited, online institution called Concordia College, which is unaffiliated with Concordia College of Bronxville, New York.

52.     Also, at various times during 2009 and 2010, Williams, FIA, and Monk's Den,
through representations in emails, message board posts, seminars, and other means, knowingly or
recklessly misled potential investors by stating that Williams had previously led a team that
successfully applied the Float Lock Down strategy to two stocks, forcing a short squeeze that in
a few weeks took their share prices from pennies to $4.40 and $7.50 respectively, earning the
team vast sums of money.

53.     Williams made these statements in a November 24, 2009 Email Alert to his
followers, a June 21, 2010 newsletter (that was also emailed to his followers), and in posts on the
Monk's Den message board.   Williams also provided this same information to a fund for which
he served as the investment adviser, which included the statement in a June 2010 prospectus
provided to Williams and potential investors.

54.     Williams knew or was reckless in not knowing that these representations were
false and misleading because Williams had never led a team that had deployed the Float Lock
Down strategy.  Moreover, although Williams had traded these stocks, he traded less than
$25,000 worth for little or no profit.

55.     Also, Williams, FIA, and Monk's Den, through representations in emails,
message board posts, seminars, and other means, knowingly or recklessly misled potential
investors by stating that Williams performed extensive research and due diligence on the stocks
he selected for the Float Lock Downs, including Cascadia and Green Oasis.  On the Monk's Den
message board created and moderated by Williams, the Defendants claimed: "We profit by
buying and holding selected stocks and locking down the float of chosen companies. . . Monk
completes extensive research before he calls any new stock."  Williams also told a Monk's Den
message board subscriber that he performed rigorous due diligence before selecting companies

as Float Lock Down stocks.  Likewise, on February 26, 2010, Williams sent an Email Alert to Monk's Den message board subscribers stating that "after extensive research" he had decided to call the Green Oasis as a Float Lock Down.

56.    In fact, Williams did not perform any significant due diligence on Green Oasis or Cascadia.  Among other things, he failed even to review the Green Oasis public filings disclosing that the company had been moribund for several years.

C.    **The Cascadia Float Lock Down**

57.    From at least May 2009 through 2010, Williams sought to increase the demand for, and the price of, Cascadia stock by recommending it as a Float Lock Down to potential investors.  To create this demand, Williams used publication of the Float Lock Down strategy to convince potential investors not only to buy Cascadia shares, but also to hold and to accumulate even more shares as the price rose.  Williams then sold his own shares at the inflated prices.

58.    During May 2009, Cascadia again hired Williams, through FIA, to promote the company and, on May 27, 2009, paid him an additional 10 million free-trading shares.   At the time, Williams also had over approximately 7.3 million of the 14 million shares that he received in March 2009, giving him over approximately 17.3 million shares from Cascadia.  Williams also had independently obtained approximately 190,000 Cascadia shares, of which he sold 145,000 during June 2009.  On March 23, 2010, Williams, through FIA, signed a formal consulting agreement with Cascadia covering the period from December 6, 2009 through at least May 5, 2010, which paid him an additional 3.3 million shares.

59.    After receiving the additional shares, on or about May 2009, Williams selected Cascadia as a Float Lock Down stock and began publicizing it in an effort to create demand and an increase in the stock's price.

60.    Williams also hired other promoters to market Cascadia, without ever disclosing this fact to potential investors.  For example, during July 2009, Williams hired another stock promoter to help him promote Cascadia, paying him 1.5 million shares.  During that same month, he hired another individual to make favorable posts about Cascadia on other message boards.  Subsequently in March 2010, Williams again hired other promoters to help promote Cascadia.

61.    By calling the Float Lock Down in May 2009 and promoting it to Monk's Den followers through 2010, Williams, FIA, and Monk's Den, knowingly or recklessly misled investors by recommending that they purchase Cascadia stock in pursuit of the Float Lock Down strategy while omitting to state the following material facts, among others: (i) that Williams had been hired by Cascadia and paid shares of company stock to promote its value; and (ii) that he had hired other promoters to help raise Cascadia's stock price.  These omitted facts would have assumed actual significance in the deliberations of a reasonable investor receiving the Defendants' recommendations to purchase Cascadia stock.

62.    To further lure Monk's Den followers to purchase Cascadia stock in pursuit of the Float Lock Down strategy, Williams, FIA, and Monk's Den, through representations in emails, message board posts, seminars, and other means, also knowingly or recklessly made materially false and misleading statements that Williams either never sold, or always accumulated, Cascadia stock in pursuit of the Float Lock Down.

63.    For example, on at least four occasions during 2009 through 2011, Williams specifically told one investor that he had never sold any Float Lock Down stocks.  Williams also communicated broadly to his followers that he always accumulated the Float Lock Down stocks and never sold a share.  Williams further publically stated on Internet Forum that he had never

sold a share of the Float Lock Down stocks.  These statements were all false statements of material fact.  As will be shown below, Williams was secretly selling Cascadia stock during this entire period.

64.     Williams, Monk's Den, and FIA also knowingly or recklessly made the following materially false and misleading statements in their efforts to persuade Monk's Den followers to buy and hold Cascadia stock:

    a.  Williams told at least one Monk's Den message board subscriber – and likely others – that Cascadia would be obtaining an online gambling website, and that one of its social network websites had seen an increase in activity from 700 to 10,000 "hits" in 45 days.  This statement was materially false because Williams knew, or recklessly disregarded, the fact that Cascadia was never involved in purchasing an online gambling site and that its social networking websites never received any significant traffic.

    b.  On June 16, 2009, during an email exchange with a Monk's Den member about Cascadia's stock price, Williams stated that "we have a long way to go yet," and that he had "added more [Cascadia stock] today."  This statement was materially false and misleading because Williams omitted to state that (i) he made net sales of over approximately 2.1 million shares during June 2009 and made net sales of over approximately 6.7 million shares in the preceding three months of March, April and May 2009, and (ii) he was selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

    c.  On July 15, 2009, Williams sent an Email Alert stating that "the breakout [of the Float Lock Down] we have been holding for is at hand, especially since we now

control the float." This statement was false and misleading because Williams omitted to state the material fact that by then he had made net sales of over approximately 9.4 million Cascadia shares and had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

d. On or about July 15, 2009, at Williams' request, another Internet Forum subscriber created a favorable video chart on Cascadia, which they circulated among the Monk's Den following. Williams sent an Email Alert attaching a link to the chart, implying that it had been prepared by an independent poster. This statement was false and misleading because Williams omitted to state the material facts that (i) he had asked an Internet Forum subscriber to prepare and post the favorable video chart; and (ii) by then he had made net sales of over approximately 9.4 million Cascadia shares and had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

e. On July 20, 2009, as part of an Email Alert, Williams sent another video chart of Cascadia stock prepared by the same individual – again without disclosing that the favorable chart had been prepared at Williams' request – and stating that "the breakout we have been holding for is at hand, especially since we now control the float . . . ." This statement was false and misleading because Williams omitted to state the material facts that (i) he had asked an Internet Forum subscriber to prepare and post the favorable video chart; and (ii) by July 20, 2009, he had made net sales of over approximately 9.8 million Cascadia shares and had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

f.  On August 12, 2009, Williams sent an Email Alert again recommending that Monk's Den followers buy Cascadia, stating that "only 8 million shares remain" and that "brokers are 12 million shares short, with any buying pressure [moving] them right out of the way."  This statement was false and misleading because Williams omitted to state the material facts that he had by then made net sales of over approximately 9.5 million Cascadia shares and had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

g.  On August 19, 2009, Williams sent an Email Alert stating, "I am not selling [Cascadia] and our core group is not selling either . . . we have worked very hard to get the float locked."   This statement was false and misleading because Williams omitted to state the material facts that (i) by then he had made net sales of over approximately 9.5 million Cascadia shares and (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

h.  On October 19, 2009, Williams sent an Email Alert to the Monk's Den message board subscribers stating that Cascadia had a $3 million real estate portfolio, information he purportedly obtained from Cascadia's CEO.  This statement was materially false and misleading because Williams knew, or recklessly disregarded, the fact that Cascadia's own public filings revealed that its real estate portfolio had a net value of approximately $11,000.

i.  On November 24, 2009, Williams sent his followers a page long Email Alert on Cascadia reiterating that it was his "favorite play," that they had locked up 44.5 million of the 49.8 million float, and that market makers were over 14 million

shares short.  This statement was false and misleading because Williams omitted to state the material facts that (i) he had by then made net sales of over approximately 14 million Cascadia shares, and (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

j.   In the same November 24, 2009 email, Williams continued to encourage his followers to buy Cascadia, stating: "[If] you have ever been in a short squeeze then you will understand why [it is] important to accumulate all you can during times like this."  This statement was false and misleading because Williams omitted to state the material facts that (i) he had by then made net sales of over approximately 14 million Cascadia shares, (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy, and (iii) he had not previously participated in a short squeeze.

k.   On January 8, 2010, Williams sent an Email Alert attaching a Cascadia press release, adding that he would be buying more shares and noting that "this could be the catalyst that will help us force the squeeze."  This statement was false and misleading because Williams omitted to state the material facts that (i) by then he had made net sales of over approximately 14.5 million Cascadia shares, and (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

l.   On January, 14, 2010, Williams sent an Email Alert asking investors to "dig deep empty the sofa and help me out" as "we are very near the market makers starting to cover and switch to the long side."  This statement was false and misleading

because Williams omitted to state the material facts that (i) he had by then made net sales of over approximately 15 million Cascadia shares, and (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

m.  On February 7, 2010, a Den member asked Williams if he had sold Cascadia stock during its price rise [during approximately January 6, 2010 to February 5, 2010] from $.07 to $.13.  Williams replied that he had not, because "it would be counterproductive to sell when we are trying to lock up the float" and the "idea is to get all the shares when the market makers are trying to short it."  In addition, Williams stated that he would "rather sell when [Cascadia's price] was much higher" as "we are still [in] foreplay mode."  These statements were false and misleading because Williams omitted to state the material facts that (i) he had by then made net sales of over approximately 15 million Cascadia shares, (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy; and (iii) he had in fact made net sales of over approximately 635,000 Cascadia shares during its price rise from January 5 through February 5, 2010.

n.  On March 10, 2010, Williams sent an Email Alert stating that "our three float lock down plays remain in full effect, [Cascadia], EIGH and GRNO" and told his followers that "if you have the ability to add to them do so as you can."  This statement was false and misleading because Williams omitted to state the material facts that (i) he had by then made net sales of over approximately 20 million

Cascadia shares and (ii) he had been selling his Cascadia stock holding in contravention of the purported Float Lock Down strategy.

    o.   On April 16, 2010, Williams posted a message on the Monk's Den message board stating: "For all those worried about [Cascadia] or any of our plays . . . let me just say that I think an exit at this stage of the game would not be wise."   This call to resist selling Cascadia stock was false and misleading because Williams omitted to state the material facts that (i) by then he had made net sales of over approximately 20.5 million Cascadia shares, and (ii) he had been selling his Cascadia stock holding in contravention of the Float Lock Down strategy.

    65.   When the anticipated short squeeze had failed to occur by June 2010, Williams blamed anonymous "flippers" who had sold their shares for short-term profits and undermined the Float Lock Down strategy.  In a June 2010 newsletter, Williams stated: "[when Cascadia] reached the recent highs in the .60's and .70's, it was literally more money than some had ever seen and they simply couldn't resist taking advantage of it."

    66.   To encourage his followers to continue to buy and hold Cascadia stock, Williams told them that he was accumulating shares during this time and remained committed to the Float Lock Down strategy.  In a June 2010 newsletter, Williams stated that while he and the other "core longs" had "no problem continuing to accumulate the stock," it is only "when the team and followers get on the same page [that] our Float Lock Downs will squeeze."  Williams also told an employee, who was also a Monk's Den member, that he lost money by buying Cascadia shares in an effort to counter those who were selling shares.  These statements were false and misleading because, in fact, Williams did not follow the Float Lock Down strategy but was selling his Cascadia shares.

### D.    Williams Scalps His Followers

67.    During 2009 and 2010, Cascadia's stock price surged as Monk's Den followers began buying shares in the hope of locking the Float and triggering a short squeeze.  From June 2009 through March 2010, Cascadia's price rose from lows of $.0032 per share to a high of $.72 per share, before beginning a gradual price decline, which, by the end of the year had reached $.02 per share.

68.    During the time Williams promoted the Float Lock Down strategy for Cascadia stock, Williams failed to disclose to his followers that he was selling large quantities of Cascadia stock.  Instead, as discussed above, he affirmatively misled potential investors to believe that he was participating in the Float Lock Down by buying and accumulating Cascadia shares.

69.    Overall, from March 2009 through August 2010, Williams sold over 24 million Cascadia shares, making profits of over approximately $2 million.

   a.    During June 2009, Williams made net sales of approximately 2.1 million Cascadia shares for profits of over approximately $51,000.

   b.    During July 2009, Williams made net sales of approximately 700,000 Cascadia shares for profits of over approximately $36,000.

   c.    During November 2009, Williams made net sales of approximately 4.1 million Cascadia shares for profits of over approximately $180,000.

   d.    During January 2010, Williams made net sales of approximately 600,000 Cascadia shares for profits of over approximately $46,000.

   e.    During February 2010, Williams made net sales of approximately 3.5 million Cascadia shares for profits of over approximately $634,000.

    f.    During March 2010, Williams made net sales of approximately 1.7 million Cascadia shares for profits of over approximately $716,000.

    g.    During April 2010, Williams sold approximately 421,550 Cascadia shares for profits of over approximately $266,000.

    h.    During May 2010, Williams sold 1 million Cascadia shares for $300,000 in a private transaction.

### E.    The Green Oasis Float Lock Down

70.    From at least February 2010 through July 2010, Williams, both directly and through FIA and Monk's Den, used emails, message board posts, seminars, and other means to market a Float Lock Down strategy for Green Oasis stock.  In doing so, the Defendants knowingly or recklessly misled investors by recommending that they buy, hold and accumulate more shares of Green Oasis stock, but failing to disclose the material fact that the Float Lock Down's promoter, Williams, was selling his own shares of that same stock.

71.    During late February 2010, Green Oasis hired Williams to promote the company by, among other things, selecting the company's stock as a Float Lock Down target.  Green Oasis paid Williams 1.4 million shares for $0.1 per share, at a time when the stock was trading at $0.8 per share.  On February 26, 2010, the day after Williams received the first 650,000 of his shares, he sent an Email Alert selecting Green Oasis as a Float Lock Down.  Subsequently, Williams posted the selection of Green Oasis as a Float Lock Down on the Monk's Den message board, and maintained it as a Float Lock Down stock throughout at least 2010.

72.    Almost immediately after selecting Green Oasis as a Float Lock Down, Williams began selling his personal holding of the stock.  By the close of trading on February 26, 2010, the share price of Green Oasis more than doubled, rising to $0.19 from its previous day's closing

price of $0.08.  That same day Williams sold 450,000 Green Oasis shares, realizing profits of approximately $61,250.

73.    Also on February 26, 2010, Williams learned that Green Oasis would be issuing on March 1, 2010 a press release announcing that a purportedly independent publication had set its price target for the company.  Williams also learned that two marketing groups would be sending the press release through their email databases the same day.  Williams sold the remaining 150,000 promotional Green Oasis shares on March 1, 2010, realizing profits of over approximately $37,815, as Green Oasis' stock price rose from $0.19 to $0.29 by the close of trading.

74.    On March 10, 2010, Williams received the remaining 800,000 Green Oasis shares owed from the company as part of his promotion agreement.  The same day he sent an Email Alert stating that "the lock down plays remain in full effect, CDIV, EIGH and GRNO[Green Oasis]" and encouraging potential investors "to add to them [as they] can."  This statement was false and misleading because Williams omitted to state the material facts that (i) he had by then made net sales of approximately 600,000 Green Oasis shares for profits of nearly $100,000, and (ii) he had been selling his Green Oasis stock holding in contravention of the Float Lock Down strategy.

75.    From March 16, 2010 through March 31, 2010, Williams sold another approximately 360,000 Green Oasis shares at prices ranging from $0.29 to $0.47 per share, realizing profits of approximately $130,154.  Williams continued to sell Green Oasis shares during April 2010, selling approximately 310,000 shares at prices ranging from 0.31 to 0.51, and realizing profits of approximately $126,749, even as he continued to encourage potential investors to purchase the stock as part of the Float Lock Down.

76.     From May 1, 2010 to May 31, 2010, the stock price of Green Oasis declined from $0.42 to $0.24.  Williams, however, maintained Green Oasis as a Float Lock Down stock, even as he continued to sell his remaining shares.

77.     From May 10, 2010 through June 2, 2010, Williams sold another approximately 109,500 promotional Green Oasis shares for profits of approximately $32,614.  By this time, Williams had sold 1.38 million of his 1.4 million promotional Green Oasis shares for profits of nearly $375,000, without having purchased a single Green Oasis share on the open market, and without ever disclosing his promotional compensation or selling activity.

### F.    <u>Williams Scalps His Advisory Client</u>

78.     During April 2010, one of Williams' followers (hereinafter "Den Member 1") arranged for Williams to teach a Monkinar in Japan to a group of potential Japanese investors. After the seminar, a number of these individuals inquired whether Williams would be willing to invest their funds using the Float Lock Down strategy.  Williams agreed and, together with Den Member 1, began the process of creating a pooled investment vehicle through which Williams would purportedly apply his Float Lock Down strategy.

79.     Den Member 1 introduced Williams to a New Zealand-based investment bank (the "New Zealand Bank"), which agreed to help create a fund through which Williams would apply the Float Lock Down strategies.  Through an affiliated company, the New Zealand Bank created the U.S. High Performance Fund ("USHPF"), for which Williams would serve as investment adviser.  According to the Investment Management Agreement between Williams, the Trustee for the USHPF, and the Administration Manager for the USHPF, Williams would receive a fee of three percent of the realized profits from each trade.  Williams and Den Member 1 obtained approximately $3.5 million in funds for the USHPF from investors.

80.     Meanwhile, from June 2, 2010 through June 22, 2010, Williams purchased 158,681 Green Oasis shares for $42,237 on the open market for his personal account.

81.     From July 7, 2010 through August 11, 2010, Williams, as investment adviser for the USHPF, purchased over 2.6 million shares of Green Oasis for the fund at a cost of nearly $1.3 million.  Green Oasis' share price, which had been trading at around 0.24 for several days, rose to .31 by the close of trading on July 7, 2010.  Williams continued to purchase additional shares for the USHPF through August 11, 2010, and the price rose to over $0.72, often trading well above $0.60.

82.     While Williams purchased Green Oasis stock for the USHPF as its investment adviser, from July 8, 2010 through July 13, 2010, Williams sold the remainder of his personal Green Oasis stock position: 178,681 shares, for $78,484, realizing profits of approximately $36,000.  Williams never disclosed these sales to the USHPF, its Trustee, or the investors in the fund.

## First Claim for Relief
### (Violation of Section 17(a) of Securities Act By Defendants)

83.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 82 above as if set forth fully herein.

84.     Defendants, directly or indirectly, acting intentionally, knowingly, or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities:  (1) have employed or are employing devices, schemes, or artifices to defraud; (2) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; or (3) have engaged or are engaging in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

85.    By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## Second Claim for Relief
### (Violation of Section 17(b) of Securities Act By Defendants)

86.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 82 above as if fully set forth herein.

87.    During 2009 through at least 2010, Defendants, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, published, gave publicity to, or circulated communications that, though not purporting to offer securities for sale, described certain securities.

88.    Defendants received and were to receive consideration for such activities from or on behalf of the issuer of these securities and did not fully disclose the past or future receipt of such consideration and the amounts thereof.

89.    By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 17(b) of the Securities Act [15 U.S.C. §77q(b)].

## Third Claim for Relief
### (Violation of Section 10(b) of Exchange Act and Rule 10b-5 By Defendants)

90.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 82 above as if set forth fully herein.

91.    Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) have

employed or are employing devices, schemes, or artifices to defraud; (b) have made or are

making untrue statements of material fact or have omitted or are omitting to state material fact(s)

necessary to make the statements made not misleading; or (c) have engaged or are engaging in

acts, practices, or courses of business which operate or would operate as a fraud or deceit upon

certain persons.

92.     By engaging in the conduct described above, Defendants have violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### Fourth Claim for Relief
### (Violation of Sections 206(1) and 206(2) of Advisers Act By Williams)

93.     The Commission repeats and incorporates by reference paragraphs 1 through 82

as if fully set forth herein.

94.     During the relevant time period, Defendant Williams was an investment adviser

within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

95.     During the relevant period, Defendant Williams, by use of the mails, and the

means and instrumentalities of interstate commerce, directly or indirectly, while acting as an

investment adviser, knowingly, willfully, or recklessly (1) employed or is employing devices,

schemes, or artifices to defraud clients or prospective clients; or (2) engaged or is engaging in

transactions, practices, and courses of business that operated as a fraud or deceit upon clients or

prospective clients.

96.     By reason of the foregoing, Defendant Williams violated, and, unless enjoined,

will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §80b-6(1) and

80b-6(2)].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court:

### I.

Find that each of the Defendants committed the violations alleged in this Complaint;

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil

Procedure, permanently restraining and enjoining each of the Defendants from violating the laws

and rules alleged against them in this Complaint;

### III.

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-

judgment interest, derived from the activities set forth in this Complaint;

### IV.

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)],

and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

### V.

Order that Defendant Williams be prohibited from participating in an offering of penny

stock, including engaging in any activities with a broker, dealer, or issuer for purposes of issuing,

trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to

Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange

Act [15 U.S.C. § 78u(d)(6)];

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

## VII.

Grant such other relief as this Court may deem just or appropriate.

## **JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

Dated:  July 20, 2012

/s/  R.M. Harper II
Richard M. Harper II (Mass. Bar No. 634782)
Kevin M. Kelcourse (Mass. Bar No. 643163)
Asita Obeyesekere (D.C. Bar No. 4516137)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8979 (Harper direct)
Facsimile:   (617) 573-4590
E-mail:  HarperR@sec.gov

/s/John Hughes
John Hughes, Chief Civil
Connecticut Bar #ct05289
Local Counsel for Plaintiff
U.S. Attorney's Office
157 Church Street, Floor 25
New Haven, Connecticut 06501
(203) 821-3700
John.hughes@usdoj.gov